v. Mendez. Mr. Klug, will you come and speak with us this morning? Good morning, Your Honor. I want to address first the sufficiency issues with regard to this mortgage fraud prosecution. And to turn first to the case of Marie Mendez. Ms. Mendez was the wife of one of the sons of a family business. And she basically was employed in an administrative capacity doing more or less ministerial things. The government points out at one time she notarized the document. She was responsible for signing some checks. And she herself... She did sign, though, a false loan application, right? She signed an application. There was no showing at trial, despite all the evidence and all the effort the government put into this case, no showing at trial that those false statements were on the application when she signed it. Or even, and as to one document, there was even an admission by the government that there was a forgery. So that she did not... Her signature appears on documents that... She signed a loan application for Unit 206 at Blue Waves, right? Yes. And that application falsely stated that her employer was D&G Medical Center, that her income was $10,800 a month, and that the apartment would be her primary residence, right? Her signature is on that document. Yeah. And all of those statements that are also on that document were false, right? Those statements are false. It was not her primary residence, etc. However, unlike the case that the government has cited, the Seventh Circuit case the government has cited, Cavallo, this circuit has not adopted the sort of the strict liability standard that if your signature appears on a document that has false statements, then you must have known... Those statements must have been on the document when you signed it, and you must have known that they were going to be there, that sort of thing. So even in a vacuum, that evidence is not proof of a knowing false statement. But we don't have a vacuum here. We have a case where the government presented substantial evidence, and it was undisputed, that the core engine of these false applications was the mortgage broker company that put all this information in after people signed it. They gathered signatures, and they filled things in. Yeah. I thought we, our court though, has said that a jury could reasonably infer that a defendant was aware of the contents of a document that he or she signed in Cavallo. My understanding is if the information is on the document when the person signs it, you can presume, I mean, it's a normal presumption. I think that's a normal presumption. Isn't it a reasonable inference though that the person would not have signed it as just a blank form? I mean, they could have, but it would be reasonable to infer that they didn't too. If we were to address that question in a vacuum, I think the answer could go either way. I personally think that it's not enough to meet the beyond a reasonable doubt standard. But we're not in a vacuum, is my point in this case. Because in this case, the government's case, the government presented the witnesses who actually put this information in the documents. They presented them at trial. They called them hospitals. They called these people. And it was, there's overwhelming evidence that this is not how it went, that they took care of what was in it. And there was not a single witness. The hospitals deal with her. Not a single witness said that this information was on there when she signed it. And so in that context, that's not substantial evidence of wrongdoing. Again, and we're talking usually in these cases when we're talking about straw buyers. And this is not a straw buyer transaction as to Marie. She's buying this house. She's buying this apartment. And for herself. So that it's even less of the usual run-of-the-mine situation where somebody's, you know, you have evidence, I'm being paid to use your name, so you know that's going to be phony and that sort of thing. There's none of those circumstantial indicia that accompany it. I thought there were three apartments where she signed papers for them. So you're saying she signed three blank papers? She signed papers as to which some of the information was blank on three of them, yes. That's correct. That's what, I mean, the evidence was, that was... Well, I mean, the jury could consider that. Time and time again you sign papers that have major holes in them every time you go to buy an apartment. And how can she, how can she have a primary residence three different apartments? Well, she couldn't. But again, that's information that's put on there, as far as this record shows, unknown to her when that is put on there. But she's filling out paperwork for three different apartments. She's given, she's given a stack of paperwork on apartments she's purchasing by the mortgage broker who says I'm handling everything. The mortgage broker actually testifies at trial. So the government wants, it's a government witness, the mortgage company, everybody's pled. The government wants to show anything to show that she knows that there's something false in those documents when she's signing them. The government has the opportunity to do that. The government doesn't do that. Okay. And then she's signing checks. And these checks are going to different companies, right? And she's signing, she's, okay? Yes, yes. And some of these companies were companies that, did they have any functions other than to receive money in connection with this? Was there testimony as to other things these companies did? Well, there's no testimony that she knew of what these companies did. There's only testimony is that she has an administerial responsibility to send checks to companies. I mean, that's the point. In an ordinary case, you have, you either have witnesses or you don't have witnesses. They had the witnesses. They have the people there. And you have the opportunity. If there is any evidence that she knows that something that she's doing that in and of itself is not unlawful, then they could present it. Was there a willful ignorance charge in this case? There was a deliberate ignorance charge, and that goes back to some of the exclusion of the evidence because the whole deliberate ignorance theory was a little bit skewed. If Marie is supposed to be deemed to be irresponsible for signing documents without filling out and making sure every detail is correct ahead of time and relying on the mortgage company, then why is it not appropriate for her to have the opportunity to show what the environment was, that the banks didn't even look at this information? So why is she supposed to be looking at this information? Why can't she just trust the mortgage broker? The only thing the bank cares about is whether the property is worth, you know, substantially more than the loan amount. And so if, again, particularly in this context of this case and given that type of restriction on the defense evidence, it's particularly inappropriate to deem her culpable on a deliberate ignorance or any other theory. The plain fact was that she's a spouse who buys three properties, and there's no idea. It's just ambiguous. We just don't know. Did she know? Was anything wrong or not? We don't have what is the key in a circumstantial conspiracy case of finding conduct that would not have been engaged in but for knowledge of the conspiracy. That's what's absent. And when you have a circumstantial evidence, that's what takes it from just being speculative to something that proves something. Let me suggest that one thing you ought to do before you sit down is address the sentencing issue about her and the failure of the district court to make a finding about her individual relevant conduct. Yes, the district court did fail to make that finding and that it was objected to. It was a failure. It makes only a harmless error. The harmless error theory is that because a variance was imposed, the error is harmless. I thought the government argued a little more than that. It cited the Siegelman case to say that the district court had pointed to enough evidence to make it clear why it was what its finding was with respect to her relevant conduct. I'm not saying I'm persuaded by their argument, but I'm saying I thought that's what the argument was. I may be missing some of their argument. You may be exactly right, Your Honor. I just don't see that there's anything in the record that substantiates that. I think what's in the record is a finding of minimal participation. To me, that's actually contradictory to a full scope of relevant conduct. I know that they cite that. They cite that, well, the district court went ahead and made findings. They say minimum. I think it was minor participants the district court found. Again, that finding would tend to cut against saying she must necessarily have had knowledge of the entire scope of things. The way I read this, the district court was saying, well, what she did was minimal in the context of this scheme, but this scheme was huge. Therefore, it's more than a small participation in that if you look at it in the context of what this scheme was, what she did was significant. I think that's what he was saying. One is absolute and one is a comparison. That's how I read it. I'm not sure I disagree. That's a possible reading, I suppose, as well. Again, I don't think that meets the test, which is a relatively rigorous test. These guideline application decisions are essentially life and death type decisions. It may not have worked out that way for her in this case because she did get a variance, but it's a life and death decision. If you find it's losses of $27 million instead of losses of $400,000, it makes a big difference. I want to ask you something about the loss. What are you saying about the secondary purchasers, that somehow there should have been an extra loss calculation? We have a loss between the amount that was originally lent and the collateral. Then what are you saying, what's your argument about this secondary purchaser? The phenomenological argument first begins with the fact that you have this great variance between restitution and loss. We have an inherent lack of reliability in where these calculations are coming from. When you get to the actual claims of loss by anybody, they amount to $6 million or $7 million less than what the government claims the actual loss is. We already know there's something wrong with it. The other problem with the sub-successor lender problem comes to the problem again, and this goes back to some extent to the trial error issue of what did the banks know and when did they know it, of who's responsible for the loss. At a certain point, what the initial lender does with the loan to the sub-successor lender is not necessarily attributable to the initial borrower. I don't know what you're saying. They sold probably these mortgages in a package, so they sold them and there's a loss somewhere. Why for purposes of loss does it matter who suffered the loss? For restitution that might matter, but why does it matter who suffered the loss? In part, the government has a footnote about this in terms of the cumulative nature of the loss. In other words, the bank knows there's problems with this loan. This loan is on the down slide. We're going to farm it off to somebody else. Then that loss at that point, the loss that the successor has from purchasing a lot at a discount, a mortgage that has already been damaged, I don't know that that consequential loss downstream loss is automatically attributed to the initial borrower. That's not just to address the mortgage crisis problem in general, but in the specific context of our argument at trial that the banks were doing this knowingly. But we can look at intended loss as well, right? Yes, but the intended loss, of course, here in a reality-based scheme in terms of the reality of their minds, was there was no intended loss. These were very successful real estate developers who had sold hundreds and hundreds of condominiums and always done well. The intended loss, that's why I think the government relies on actual loss. Okay. Mr. Klug, you've saved five minutes for rebuttal. Mr. Valentini. Thank you. Good morning, and may it please the Court. Francesco Valentini for the United States. Unless the Court has any questions about the conviction in this case, I would begin with the sentencing issues that Your Honors, that my opponent just discussed. If you could just help me out with Marie, and just tell me what the evidence is that she knew what was going on. Just list it quickly. Yeah, absolutely. So with respect to the conviction of Marie Mendez, one of the counts, as was discussed before, had to do with her serving as a straw purchaser for one of the units. In that case, there is no dispute that the loan application that she signed contained falsehoods with respect to employment, income, intent to occupy. That's the Unit 206 at Blue Waves, right? Correct, and that is the false statements that underlies Count 5 in the superseding indictment. In addition to that, my opponent, based on those falsehoods alone, and the fact So you put in the document with the falsehoods, and they tried to establish that the Masvidals actually were filling in all this data. And so your answer is the jury can decide this issue. There's an inference that she knew what she was doing. Based on this court's precedent, United States v. Cavallio, that would be a permissible inference for a reasonable jury to draw. But in addition to that, in this case, there is considerable evidence that supports a finding of knowledge. For instance, as Your Honor pointed out before, this was not the first application that contained false information that Marie Mendez submitted. Within the 25 days preceding this application, she had submitted two additional applications containing false information. Mr. Clute, though, says that there's evidence that when she signed these, that the forms had blanks. Is that true? My opponent, I think, is asserting that there was testimony that in some instances the mortgage brokers were capable of producing documents in support of applications or changing applications, but there's no evidence that these particular applications were changed in any way. He's trying to draw from some generalized testimony about what the mortgage brokers were doing in some instances were capable of doing. He's trying to infer from that. In this particular instance, there was some modification of the application for which there is no evidence in the record and certainly no evidence that the jury was required to credit. Tell me this. Was there evidence that when some of the false loan applications were filed, just generally, that they already contained the false information when they were signed? I don't believe there was a discussion as to particular applications when the information was input. One way or another? I believe that's correct. But the way this particular scheme worked was that the Mendez were recruiting through recruiters that were recruiting strop purchasers, and the strop purchasers were compensated and were willing to essentially loan their credit history so that the mortgages could be extended. In that sense, they were participants of the overall scheme in any event. Tell us as much as you can specifically about Ms. Marie Mendez and her knowledge. As I mentioned before, she had signed two applications within the 25 days leading up to this event. She also lied after the fact in 2009-2010 in connection with a mortgage that was extended in this case. From that, too, from her willingness to lie in connection with this mortgage. These were the letters she sent about the hardship letters that she sent about the mortgage and claimed that she didn't have money in her bank account when, in fact, she did. Correct. Correct. Those would be the letters where she misrepresented her financial conditions. She also submitted three affidavits in connection with the applications that were clearly titled Affidavits of Occupancy, where she stated that the residences would be her primary residence. Of course, she could not have three primary residences, let alone three primary residences, where she planned to stay within the 25-day period. In addition, Marie Mendez also had considerable involvement in the overall family scheme. Tell me about the signing of these checks and why that allows some reasonable inference of her awareness of what's going on with the conspiracy or an awareness of the fraud. Right. Under this Court's precedent, the nature of the conduct itself can be probative of the mental state of a defendant, of a fraudster. In this case, Marie Mendez was, as part of her role in the conspiracy, she was signing two types of checks. First, she was in charge of signing checks that would funnel rental proceeds, because some of these properties were being rented, back over to the straw-purchase recruiters so that it could be used, depending on the particular agreement with a particular recruiter, to make some of the mortgage payments that were made for a couple of years, up to three years in some cases, with respect to the conspiracy. Separate from this check-signing activity, she also signed checks that funnel mortgage proceeds themselves. In three instances, back to recruiter Chacon, who worked in connection with mortgage broker Assef. In those instances, she used a shell company, of which she was treasurer, to funnel proceeds that came either directly from the title company, or in two instances, from the Barmaco entity that was owned by her mother-in-law, to funnel the proceeds to Chacon so that those proceeds could then be used for the agreement under the conspiracy. From that constellation of evidence, as well as the fact that she was in charge, essentially, of the office, she was the office manager at Yolanda Villas, which was the epicenter of this particular conspiracy. If you look at the counts in the indictment, most of them arise from transactions at Yolanda Villas. From this constellation of evidence, the jury could more than reasonably conclude that Marie Mendez participated in the conspiracy with a requirement of state. If I can move on to the sentencing issue. She was the director and treasurer of one of those straw corporations, right? M-something-17? Correct. Right. I was attempting to touch on that just a second ago. Yeah, she was the director and treasurer of ML-17, which is a shell company that was used to funnel the mortgage proceeds for one property at Diane Condominiums and two properties at Yolanda Villas back to straw purchaser recruiter Chacon. Before you move on, I want to ask you one question about Stella Mendez, specifically Counts 16 and 19. In your brief, you concede that the government offered no evidence tying Stella to Chacon and ASEF. Could a jury infer Stella's involvement in a crime based on her involvement in the overall scheme and business? Absolutely, and this goes back to the sufficiency standard and to the discourse precedent that the jury is entitled to draw inferences based on circumstantial evidence. Yeah, specifically. Yeah, so the evidence to support these two particular accounts comes in two forms. The first is evidence of Stella's overall managerial and executive role in the context of the conspiracy. She, for instance, induced employees and family members to serve as officers in corporations, start bank accounts, make transactions, including starting a bank account that was eventually used to funnel funds to an offshore of more than $2 million to an offshore account in Switzerland. All of that evidence is sort of circumstantial evidence. It is probative, and that colors the jury's rational or reasonable inferences that the jury could reasonably draw from the evidence as to participation in specific transactions. Now, as to specifically to count 16 and 19, these are counts that involve straw purchase of recruiter Chacon. With respect to those two specific accounts, Stella Mendez signed two checks. These are two properties at Yolanda's Villas. So the mortgage proceeds were transferred from the title company into a company, into Barmako, the company that Stella and her husband operated. She signed out two checks that specifically referenced these two units at Yolanda Villas over to ML17, which is the company that was operated by her son Michael and daughter-in-law Marie. From there, those funds were transferred to Chacon, the straw purchase of recruiter. From the circuitous path that this money traveled, the jury could reasonably infer that these were transactions that were part and parcel of the overall fraud scheme in this case. There was no Pinkerton instruction given in this case, was there? There was no Pinkerton instruction given in this case. However, the jury could reasonably rely on overall evidence of Stella Mendez' role in the conspiracy to color and to draw reasonable inferences with respect to her mental state as to specific transactions. The modus operandi as to these two counts is really indistinguishable from how the rest of the operation, the rest of the scheme operated. The only difference perhaps is there were no direct contact between Stella Mendez and this particular recruiter, but there is no requirement of direct evidence to sustain a conviction for fraud. If I can touch briefly on the sentencing issues, so there's two that I recall were discussed briefly below. One has to do with the apportionment of loss. My opponent points to Martin. That's a case that has to do with restitution. For good reason, restitution treats loss differently from the guidelines. In the restitution context, the point, the objective is to make the victim whole, and for that reason, unless there is a showing that the specific loss can be linked to a specific victim, there is no restitution. That was the only issue that was discussed in Martin. Now Martin did cite a 10th Circuit case, Howard, which discussed both issues, loss for restitution purposes and loss for guidelines purposes. And as Howard, the 10th Circuit case, explains, loss in the context of the guidelines serves a different purpose. The purpose is to provide a metric of the scope of the fraud. And as to that metric, it's completely irrelevant whether a particular, the primary lender as opposed to a secondary downstream lender suffered the loss. The point is that the overall loss sustained as a result of the fraud is in the amount of the loss of unpaid principal. Now, the other, there was another point that was raised below, sorry, raised before, while my colleague, my defense counsel was at the podium, has to do with the relevant conduct finding with respect to Marie Mendez. In this case, the district court conducted a meticulous sentencing hearing. As part of the hearing, it is true there is no explicit finding as to relevant conduct with respect to Marie Mendez. However, under this court's decision in Siegelman, and I'm quoting, a district court failure to make explicit relevant conduct findings does not preclude appellate review and therefore does not warrant reversal where the court's decisions are based on clearly identifiable evidence. In this case . . . It's not clear, and then the Siegelman case goes on to explain what that clearly identifiable evidence was. I read this part of the transcript. I didn't see where the district court made this kind of finding with respect to Marie Mendez. I mean, it's like a lot of sentencing appeal issues these days where we have a downward variance. To me, it's highly likely that if we send it back to the district court, the district court is going to do the same thing again, but given what the law is, I'm not sure you've got it. If I may address this in the time that I have remaining, first of all, there is a very strong harmlessness argument in this case precisely because the district court . . . The problem with that is the Supreme Court's told us that if you're varying from the wrong guideline range, that we can't say that's harmless error. What I will say is that even under Molina-Martinez, I think the court suggested that if there is additional evidence that specifically points to the fact that the sentence will not have been different, there will be room even under Molina-Martinez. Aside from Molina-Martinez and the harmlessness error, however, I would direct the court, for instance, to page 40 of the sentencing transcript. That was a summary of the evidence that the court made in connection with a minor participation . . . minor role . . . minor participant adjustment. In that case, in that context, the court said, for instance, I believe that the evidence is . . . I see my time is up. May I conclude? You can keep going. Thank you. I believe that the evidence is sufficient to show that Ms. Marie Mendez was sufficiently knowledgeable and knowingly participated, both given a role as a straw buyer, given the receipt of the monies from Stella and the placement in particular corporation. Now, why do you run the money through one corporation and pay it out? She's in the business. She's in the family business. Then, taking the money out to pay others, so the rent could be paid, that is an activity that is not limited to the counts of conviction. It does not take a rocket scientist to figure out this is not a direct way of doing business. Now, those findings were made in the context of a different enhancement for the role . . . in connection with a role, but as Judge Rustani pointed out before, the reason why the court ultimately, despite these findings, did not conclude that . . . did apply a minor role adjustment was a comparative reasoning. She said, well, her role is more minor than Stella and other participants. But, as to these findings, these findings, I think, I was going to make very clear that the district court, the sentencing court, concluded that Marie Mendez was, in fact, responsible for the entire scope of the fraud, as a matter of a factual finding. In addition to that . . . Can you tell me that page again? This is the . . . docket entry 360 is the sentencing transcript. I was referring to page 40 in the transcript. Okay. In addition to that, I would also note that here, defendants . . . the defendants' challenges seems to mostly get at the fact that the court did not make an explicit finding as to relevant conduct. But, there's not really a challenge that we see in the brief as to the evidence . . . as to whether the evidence would be sufficient to make such a finding. It's arguments about whether the district court made an individualized finding or not. No, that's correct. That's correct. All right. Mr. Valentini, we let you go over a couple minutes, as we did Mr. Kluge. We appreciate your argument. Mr. Kluge, you saved five minutes for rebuttal. Thank you, Your Honor. Turning to, again, the . . . again, it's circumstantial evidence. And, with regard to both Marie and Stella, as to certain of these activities . . . the circumstantial evidence simply doesn't add up to substantial evidence of their . . . that they knew anything about the transaction that was a criminal. And, with Marie, the government has relied . . . I think added two factors that I didn't discuss in the initial argument. One is the three years after . . . well, actually, I think it's even longer than that after . . . she writes when the mortgages . . . she can't afford to pay the mortgages anymore. She writes a note back to the bank, which is a hardship note. And, in that note, it says, I don't have any personal accounts. It doesn't . . . you know, that's what's in the record. And, whether . . . it's not some long, detailed financial affidavit that's false or anything like that. It's, I don't have any personal accounts. It's actually an ambiguous kind of an assertion. But, basically, it's a hardship letter. It's not . . . it's not some thing that you can relate back and say, oh, then she must have known that the . . . what was in that . . . in that . . . what the Mosvidals were going to put in that document. So, I just don't think it adds up enough. It's not like they cited another case from this circuit where it relates back to the original intent. You can tell . . . the subsequent act relates back to the original intent. You can tell the person was lying about an X because, at a subsequent time, they said something that directly contradicted X. This is not that kind of thing. This is using something that somebody might, when they're in financial hardship years later, say it has . . . it's ambiguous to the extent it's false in any event, because they are in the financial hardship. It doesn't relate back to the initial thing. It . . . that doctrine should not be further extended than what it naturally is. The other things about these checks . . . again, the government . . . every time the government uses the word shell corporation, it has a sort of . . . it has a derogatory meaning. A shell corporation, if it's really a shell corporation, is going to be something that hides the owner. This is not a shell corporation. This is Marie Mendez and her husband, Michael, own a company that owns apartments, and the rental payments go into the rental company that receives it that is in their name, and then that money goes out to another company that is in their name that is the company that pays out monies for expenses. So they just have the money . . . the in money coming into one of their companies and the out money going into another. That doesn't make it a shell company. Just because the government says . . . indicts it, doesn't make it a shell company. It has a purpose. It has an excellent financial and accounting purpose, and it's not a shell because you can see right through. You can see it is them. They're on the Sunbiz documents. Anybody, you punch it in, you see their names. And so, again, those are not the badges of fraud that you have, and calling it a shell doesn't change that. The fact that the payments go out to people that they're dealing with in the real estate business, that doesn't prove that she knows some other thing, that the witnesses themselves testify, we never had any conversation about her. Do we have conversations with other people? Yeah, we can point to this one, point to this one, point to this one. But the wife of the son down this line who works as a clerk in the real estate company, no, we didn't have those conversations. So there's a sort of a slice it thin and fluff it up quality to these things that I hope the court will try to add a grain of salt to. They're not really there. It's just simple things that anybody would have done without knowledge of the crime. And, again, the theory, we've described their prosecution of Stella, their arguments on Stella as an infer opinion for a pound theory. And, again, I don't see anything very different from that in the government's argument today, which is it's wrong. You can say when you have, if conduct is permeated by criminal activity, in other words, if it's drug dealers, every single thing they do, then you could say, well, then the seventh transaction, they also knew there was drugs involved. But this wasn't that type of situation. This was a company that had hundreds and hundreds of legitimate transactions. And you have to take them on a transaction-by-transaction basis. Stella does not know because the government does not show that every single transaction that everybody is involved in is criminal so that when a given non-criminal activity, in and of itself, goes on and Stella is involved, that doesn't mean they've proven criminality. With regard to the finding as to Stella, I don't think as to Marie and the loss, I think that that's certainly not a particularized finding that the government is referring to. It's simply going back to this deliberate ignorance concept that the court was using that we felt to our disadvantage in relation to the trial issue, which is the context is so critical to understanding what people's intent actually is. Thank you, Mr. Klug. We have your case, and we'll move on to the next.